E87FTRUA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TRUMAN CAPITAL ADVISORS LP, et
al,

                Plaintiffs,

          v.                         13 CV 5945

NATIONSTAR MORTGAGE LLC,

                Defendant.

------------------------------x
                                    New York, N.Y.
                                    August 7, 2014
                                    11:15 a.m.

Before:

               HON. NAOMI REICE BUCHWALD,

                                    District Judge

                    APPEARANCES

MICHELMAN & ROBINSON
     Attorneys for Plaintiffs
ROBERT PILIERO, ESQ.

BUCKLEY SANDLER
     Attorneys for Defendant
MATTHEW PREVIN, ESQ.
ROSS MORRISON, ESQ.

E87FTRUA

1        (Case called)

2        (In open court)

3        THE DEPUTY CLERK:  13 Civ. 5945, Truman Capital

4   Advisers v. Nationstar Mortgage.  Is plaintiff's counsel

5   present and ready to proceed?

6        MR. PILIERO:  Yes, we are.  Robert Piliero, from

7   Michelman & Robinson.  With me is Rob Ontell, same firm.

8        MR. PREVIN:  Matthew Previn from Buckley Sandler.

9        MR. MORRISON:  Robert Morrison from Buckley Sandler.

10        THE COURT:  I have a few questions, maybe that's a

11   good way to begin.  Just as a matter of fact, was the loan sale

12   agreement ever sent to Truman Capital by anyone?

13        MR. PILIERO:  Yes, your Honor.  It was sent by the

14   agent, Auction.com, and it was sent back by Truman Capital.

15        MR. PREVIN:  Excuse me, your Honor.  We disagree with

16   that.  I'm not sure what loan sale agreement counsel is

17   referring to.

18        THE COURT:  I can tell you what I'm referring to.  I

19   don't know what he's referring to.  In the auction terms there

20   is, page 2 in the section entitled "bidding and winning," a

21   sentence that says, "Once contacted by an auctioneer

22   representative the winning bidder will be sent by e-mail the

23   loan sale agreement and certain other documents for electronic

24   signature unless otherwise directed by seller."  That's what

25   I'm referring to.

E87FTRUA

| | |
|---|---|
| 1 | MR. PILIERO:  That's what I was referring to as well |
| 2 | and that did occur.  There were two notices for different |
| 3 | tranches of two different pools where we were notified that we |
| 4 | were the winning bidder, and along with that, on the first |
| 5 | loan, the loan sale agreement was sent.  We signed it, sent it |
| 6 | back and then it fell apart because of that KIRP litigation, |
| 7 | the state court litigation you read about. |
| 8 | THE COURT:  So the second one -- |
| 9 | MR. PILIERO:  I don't know if they sent it or not, but |
| 10 | the timing was such it became moot because the ruling was |
| 11 | issued by the Judge Branson in the KIRP case.  By the way, that |
| 12 | TRO was subsequently dissolved in two or three weeks. |
| 13 | MR. PREVIN:  Your Honor, if I may.  There's nothing in |
| 14 | the complaint about this at all.  The only allegation in the |
| 15 | complaint is that the auctioneer sent an e-mail to plaintiffs |
| 16 | notifying them they were the winning bidder.  There was no |
| 17 | allegation at all about sending a loan sale agreement. |
| 18 | THE COURT:  That's why I asked. |
| 19 | MR. PREVIN:  I haven't seen a loan sale agreement. |
| 20 | I'm not aware of any loan sale agreement having been sent.  The |
| 21 | opposition papers submitted by counsel argues that the e-mail |
| 22 | itself constituted a loan sale agreement.  This is entirely new |
| 23 | to me. |
| 24 | THE COURT:  I'm not positive what they argued.  I |
| 25 | certainly think they argue that it was a contract, that the |

E87FTRUA

1    e-mail created a contract.

2              MR. PILIERO:  But there's a real fine line distinction

3    if I may make, okay?  We're not saying that the loan sale

4    agreement is the contract, okay?

5              THE COURT:  Okay.

6              MR. PILIERO:  What we're saying is the following.  And

7    it's a bit -- we didn't draft the contract and you've got to

8    step through it a little bit.  What we're saying is, and this

9    is what Mr. Previn has been saying in his papers, that the

10   auction terms were binding on the bidders.  We agree, they

11   were.  We say that they were also binding on the seller, on

12   Nationstar.  That made the auction terms a binding, enforceable

13   contract with respect to the auction process.  Not with respect

14   to the terms and conditions of the sale of the notes, but with

15   respect to the auction process.  And what we're saying is, when

16   the Court interprets the contract that is the auction terms --

17   and I can go through all the details -- we believe it is

18   inescapable that because of the way Nationstar handled the

19   bidding process -- and I can walk you through it -- a binding

20   contract to sell the notes occurred.  It was not the loan sale

21   agreement, okay?  It was a contract and I can point you to the

22   language in the auction terms that gives you the dichotomy, if

23   you will, of the disjunctive, a contract of sale or the loan

24   sale agreement.

25             So what am I saying?

E87FTRUA

1           THE COURT:  Well, you tell us.

2           MR. PILIERO:  I'd kind of like to do it in an orderly

3    way.  I don't know if I can or not.  I don't want to step on

4    his lines, but I want to answer your questions.  But there's a

5    way to build to it so that it makes sense, that it obviously

6    makes sense and it really is a question of contracts 101 in

7    terms of issue.  One is bilateral contract versus unilateral

8    contract.  If the auction terms are viewed as a contract it

9    must be viewed as a bilateral contract because it's a promise

10   for a promise.  A unilateral contract would require separate

11   consideration to be given by Nationstar to the bidders.  Their

12   position on this, in this case and in this motion, is that all

13   the bidders plunkedd their money down to register, conducted an

14   enormous amount of due diligence -- in the due diligence vault,

15   plus on their own which they were required to do under the

16   terms -- they went through three, four, five days of bidding,

17   they went and hired people to figure out -- remember, this is

18   buying mortgage notes.  You've got to find out what the value

19   is by looking at the property.  So they hire brokers to go say

20   that property is worth this, that property is worth that, this

21   is what your bids ought to be.  They go through that with

22   hundreds and hundreds of loans.

23          At the end of the day, according to Nationstar's

24   position, it gets to say "never mind."

25          THE COURT:  Isn't that exactly, though, what the

E87FTRUA

1     auction terms say?

2                  MR. PILIERO:  No.  I'll tell you why.  I have the --

3     maybe your vision is better than mine.  I blew one up.

4                  THE COURT:  You know what, my contacts are very good,

5     so I'll use mine.  I'll give you my source for the contacts.

6                  MR. PILIERO:  Very good, Judge.  If you look at the

7     section that says "bidding and winning," okay --

8                  THE COURT:  Why don't we start, though, at the

9     paragraph that says "reserve auction" in the second sentence

10    which says, "The starting bid is not the reserve price.  In

11    order to be the winning bidder for the note the bidder must

12    meet or exceed the reserve price and the bid must be accepted

13    by the seller.  See subject confirmation section below," and

14    when you look at the subject confirmation section, it says,

15    "The winning bidder acknowledges and agrees that winning

16    bidder's purchase price is subject to and contingent upon the

17    seller approving the purchase which shall be given or denied at

18    their sole and absolute discretion within five business days

19    following the close of the auction and execution of the loan

20    sale agreement by the winning bidder."

21                 So doesn't that say that the seller has five days to

22    let the winning bidder know if they've accepted the bid?

23                 MR. PILIERO:  Respectfully, no.

24                 THE COURT:  It seems to say that.

25                 MR. PILIERO:  I know.  Let me explain why.  The

E87FTRUA

1    section in which that appears is called subject to

2    confirmation.  And it begins, and therefore the entire

3    paragraph relates to, "In the event the winning bid amount is

4    not immediately accepted by the seller," okay?  It only applies

5    if there was not an immediate acceptance by the seller.  How do

6    we know what's accepted?  It goes on to say -- how do we know

7    it's not accepted?  It says, "In the event the winning bid is

8    not accepted the auctioneer will inform the winning bidder that

9    acceptance of their winning bid is subject to confirmation."

10   That's what precedes the language --

11         THE COURT:  But that's inconsistent.  Because under

12   the auction terms the winning bidder has two hours to accept --

13   to say, yes, I agree to be the winning bidder, but this

14   provision gives the seller five days to in its sole discretion

15   reject or accept the --

16         MR. PILIERO:  I have a different reading of it.  I

17   have a reading of it that that is exactly true and the position

18   is exactly true that the seller gets to say I don't accept your

19   bid, only if its agent Auction.com says you're the winning

20   bidder, but it's subject to confirmation.

21         THE COURT:  But the auctioneer and the seller are two

22   different entities.

23         MR. PILIERO:  But --

24         THE COURT:  And that's quite clear throughout the

25   terms because there are points where there's an actual sort of

E87FTRUA

dichotomy.  They aren't mushed into one.

          MR. PILIERO:  I understand and that kind of reinforces

respectfully what I'm saying.  Going back to that first

sentence of "subject to confirmation," the auctioneer is the

one who designates the Winning Bidder; capital W, capital B.

The auctioneer does that and he does that in order to signify

whether or not the winning bid was or was not immediately

accepted by the seller.  How does he signify acceptance by the

seller, which of course is the last step in the formation of

the contract?  He does it in the negative; you won the bid,

that means you met all the prices, beat the reserve prices, you

beat everybody else, you're the winning bidder, but it's

subject to confirmation.  If you do that then we get to buy the

stuff.  If they don't do that --

          THE COURT:  If as a matter of historic fact it turned

out, leave aside all this discussion, the auctioneer failed to

call the seller and say do you accept this --

          MR. PILIERO:  There's no actual record that says this,

Judge.  That didn't happen.  It works the other way.  If you're

the winning bidder the deal is accepted unless they

affirmatively say it's --

          THE COURT:  Then you have to, then the auctioneer

would have an obligation to contact the seller and get their

permission.  Otherwise you've made the auctioneer the same as

the seller for purposes of proceeding with the deal.  The

E87FTRUA

auctioneer is not the seller.

1

2            MR. PILIERO:  Two answers to that, Judge.  One is, we

3    don't know whether or not the auctioneer did or did not call

4    the seller.  We don't know whether he did or not.  We don't.

5            THE COURT:  But this isn't a situation if -- just

6    logical.  If the auctioneer had called the seller and the

7    seller said, "Fine with me," and then there was this state

8    court action TRO that got lifted, presumably the seller would

9    have continued to say, "Fine with me, they're yours."

10           There seemed to be two theoretical reasons that the

11   seller would after this whole process say no.  One has to do

12   with this state court case which doesn't actually I think

13   affect all of the mortgages, correct?

14           MR. PILIERO:  Correct.

15           THE COURT:  It's only a portion.  So that wouldn't

16   have prevented the deal going through, at least in part.  The

17   other reason, just sort of logical, would be the bids on this

18   pool of mortgage notes were so high and there were so many of

19   them that the seller says to themselves, you know, we kind of

20   mispriced this.  We could do a lot better, and they say let's

21   pull it and do it again.

22           But that reason would, if that were really what

23   happened, and of course I have absolutely no idea what happened

24   here, then the seller would never have said to the auctioneer

25   accept this bid, because they would have realized right up

E87FTRUA

| 1 | front, like, we priced our house, you know, we got a bidding |

1    front, like, we priced our house, you know, we got a bidding

2    war on the house, we really priced it too low to sell.  So it

3    just doesn't sort of logically work that the auctioneer really

4    got permission from the seller to go ahead.

5              MR. PILIERO:  See, but, if I may, you are, I believe,

6    flipping the construct.  The contract that their side drafted

7    did not say the auctioneer will get approval from the seller

8    and then tell you that it's a good deal and you're the winning

9    bidder and you can buy it.  It doesn't say that.  What it says

10   is that the seller has authorized the auctioneer to declare the

11   winning bidder, doesn't say anything about getting approval

12   from the seller --

13             THE COURT:  Wait a minute.  It sure does.  If you go

14   on to page 5, I think it couldn't be much clearer.  "No

15   obligation to sell shall be binding on seller unless and until

16   a written contract of sale or loan sale agreement is signed and

17   delivered by seller."

18             MR. PILIERO:  Judge, I got that.

19             THE COURT:  Right?

20             MR. PILIERO:  I got that, and if I had drafted the

21   contract that you had you wouldn't have the inconsistencies

22   that this contract has.

23             THE COURT:  I think that where -- I understand.

24             MR. PILIERO:  Let me put it a different way, if I may.

25   Basic principle of contract construction is you've got to give

E87FTRUA

1    effect to all the terms.  Right?

2              THE COURT:  Okay.

3              MR. PILIERO:  What do we do with the term that says in

4    the event the winning bid amount is not immediately accepted by

5    the seller -- you don't need that.  If the only trigger to an

6    obligation to sell the notes was a signed sale agreement you

7    don't need that provision, you don't need bidding and winning,

8    you don't need half the provisions in this contract because

9    it's all covered.  That's all surplusage.  I believe the law is

10   that we're supposed to find a reason and harmonize all the

11   provisions in the contract and, respectfully, these provisions

12   have no place in this contract if in fact the only trigger to a

13   sale obligation was to sign the loan sale agreement.  I believe

14   that.

15             Number two, I also believe that the notion of all the

16   penalties that they can impose, specific performance,

17   liquidated damages, everything else, for a default, what does

18   that connote?  A default on what?  A default on a contract.

19   You can't impose penalties unless you have a contract.  So

20   there is a contract that they entered into, which is the

21   auction terms.  And the contract says that if I don't buy, if I

22   don't buy the notes --

23             THE COURT:  That just can't be right.

24             MR. PILIERO:  Judge, we wouldn't have drafted it this

25   way for sure.  But at a minimum -- well, I believe it's clear,

E87FTRUA

1    but I understand you think it's clear the other way.  At a

2    minimum --

3                THE COURT:  The question is, I think, or a way to kind

4    of think through this, is which of the provisions in the

5    auction terms are the ones that are clearest in sort of like

6    one syllable.  Which are what one might call the black letter

7    provisions, the ones that are most declarative, easiest to

8    understand, the ones in English, the ones that don't require

9    intelligent lawyers interpreting them.  And it seems to me

10   that, this is, you know, my current thinking, is that there are

11   four provisions that are not by themselves subject to

12   interpretation, that all speak to the seller having a bottom

13   line right to accept the bid, to not be bound, unless and until

14   the seller does certain things.  And I think that your

15   arguments are sort of more nuanced.  I'm not saying they're,

16   like, crazy.

17               MR. PILIERO:  I'm saying the same thing you are.

18   Focusing on until the seller does certain things.  The first

19   sentence of the section "subject to confirmation" tells us one

20   way in which the seller does certain things.  You're focusing

21   on the other way, the loan sale agreement.  This one says the

22   way the seller focuses is by having the auctioneer tell the

23   bidder when it says you're the bidder, when it says you're the

24   winning bidder, the seller gets to say never mind if it says

25   it's subject to confirmation.

E87FTRUA

1          THE COURT:  But you go back and go to the reserve

2     auction provision on page 2 which says not only must a bidder

3     meet or exceed the reserve price and the bid must be accepted

4     by the seller, it doesn't say accepted by the seller or the

5     auctioneer.  The seller being subject to confirmation has the

6     sole discretion to --

7          MR. PILIERO:  Can I interrupt you?

8          THE COURT:  -- has the sole discretion to either

9     approve or reject the contract individually with respect to

10    each loan.  You have the five-day provision and you have the no

11    obligation to sell shall be binding on the seller unless and

12    until there's a written contract of sale or loan agreement is

13    signed and delivered by the seller.  It doesn't give the

14    auctioneer a right to deliver a contract.  And if we're going,

15    if you want to argue that, and I don't think it really works,

16    but I understand your argument that the auction terms do create

17    certain obligations, certain behaviors, but I don't think

18    that's the same thing, and you're not arguing that it is the

19    same thing as being an actual contract of sale.

20          MR. PILIERO:  Can we agree, your Honor, that the

21    auctioneer is the seller's agent for purposes of conducting the

22    auction?  It says it in the auction terms.

23          THE COURT:  I think that's kind of what an auctioneer

24    is.

25          MR. PILIERO:  So anything that the auctioneer does in

E87FTRUA

| 1 | connection with the auction is within the scope of its |

1   connection with the auction is within the scope of its

2   authority as an agent.

3           THE COURT:  No, not necessarily.

4           MR. PILIERO:  Okay.

5           THE COURT:  Look, the whole point -- let me ask it

6   another way.  If this instead of being called a reserve auction

7   had the title conditional auction we wouldn't even be here,

8   right?

9           MR. PILIERO:  I disagree.  It depends on what the

10  terms say.

11          THE COURT:  Conditional auction means that in the end,

12  bottom line, the seller can walk away.  Right?  After the whole

13  process.  I mean, there's always going to be an auction

14  process.  Whether it has five --

15          MR. PILIERO:  But you'd never have a conditional

16  auction with a reserve auction.  Those two are inconsistent.

17          THE COURT:  Isn't it the point that the language in

18  these auction terms makes it effectively a conditional auction

19  even though it has the word "reserve auction"?

20          MR. PILIERO:  Judge, that's why it's an oxymoron.

21  There were reserve prices.  The seller didn't have to say it's

22  okay.  There were reserve prices for every piece of property.

23  $500,000, $300,000, the bid was ineligible unless it exceeded

24  the reserve price.  That was the condition.  What it says is,

25  you use the word "condition," Judge?

E87FTRUA

```
 1              THE COURT:  They also say, there is -- it's an
 2   unpublished reserve price.
 3              MR. PILIERO:  That's the whole idea.  Otherwise you
 4   know what you're bidding against.  The whole idea of an
 5   auction --
 6              THE COURT:  That's not true.  You can have minimum
 7   bids and say we're not -- the minimum bid has to be
 8   $20 million.
 9              MR. PILIERO:  That's a minimum bid, with all due
10   respect is different from a reserve auction.  Minimum bid is
11   saying don't bid less than $5, a reserve auction is we're not
12   selling for less than $5,000.  It's two different things.
13              THE COURT:  It amounts to the same thing.
14              MR. PILIERO:  Not in this case.
15              THE COURT:  Don't bid unless you can bid $5 is the
16   same thing as saying I'm not selling this to you for less than
17   $5.  There's no real difference.
18              MR. PILIERO:  With all due respect, the opening bid,
19   this is kind of aside, but the opening bid requirement is to
20   insure that there's a real auction process, okay?  It just
21   means that you don't want jerks coming in here and bidding
22   $1.50.  The other one is different.
23              Can I say one thing?  You said it before, Judge, and I
24   just want to focus on it.  You juxtaposed two very, very
25   important things, okay?  In the reserve auction section, the
```

E87FTRUA

third sentence, "In order to become the winning bidder for a
note, a bidder must meet or exceed the reserve price and the
bid must be accepted by the seller, see subject to
confirmation."

So go to subject to confirmation and it talks about
accepted by the seller.  Okay?  If the winning bid is not
immediately accepted by the seller the auctioneer must say
subject to confirmation.  The negative pregnant of that is that
if the auctioneer says you're the winning bidder but does not
say it's subject to confirmation, you've got a deal.

THE COURT:  Except that --

MR. PILIERO:  Except for the other provision.

THE COURT:  Just keep reading.

MR. PILIERO:  Sorry.

THE COURT:  You still have the five days.

MR. PILIERO:  No, Judge, that only applies -- I'm
sorry, I hate to be so contrary.  The whole paragraph is called
subject to confirmation.  That sentence that you focused on
with the five days only applies if the auctioneer had said it's
subject to confirmation, then the seller has got five days to
do something.  It doesn't apply unless they've said subject to
confirmation.

THE COURT:  But the implicit sort of reality of your
reading this as suggesting that the auctioneer effectively
binds the seller if the auctioneer doesn't include in the

E87FTRUA

| | |
|---|---|
| 1 | you're the winning bidder e-mail the word "subject to |
| 2 | confirmation," that assumes that the auctioneer did his job and |
| 3 | contacted the seller, who said it's fine.  And that is totally |
| 4 | inconsistent with the fact that the seller didn't say it's |
| 5 | fine. |
| 6 | MR. PILIERO:  But you're supplying that, with all due |
| 7 | respect. |
| 8 | THE COURT:  But it's logical.  Because otherwise |
| 9 | you're giving the auctioneer -- |
| 10 | MR. PILIERO:  You could have drafted it that way. |
| 11 | THE COURT:   -- a power that is rather extraordinary. |
| 12 | Because this is not a situation in which if the auctioneer |
| 13 | screws up Nationstar can sue him for the damages that were |
| 14 | caused by his agreeing to sell Nationstar's property to you. |
| 15 | MR. PILIERO:  There's two things, though, Judge.  I |
| 16 | believe and you disagree and that's okay, you're the judge.  I |
| 17 | believe that the construct says that the seller did give the |
| 18 | auctioneer the authority -- |
| 19 | THE COURT:  Why would they now say no? |
| 20 | MR. PILIERO:  May I finish?  Please?  Did give them, |
| 21 | did give them the authority to bind it by drafting this |
| 22 | language which says -- you don't buy that? |
| 23 | THE COURT:  I can't buy it because of all the other |
| 24 | language that gives the seller -- |
| 25 | MR. PILIERO:  Then this provision means nothing.  What |

E87FTRUA

1   do we do with this provision, throw it away?

2          THE COURT:  Sometimes contracts aren't perfect.  But

3   the point is your clients are very sophisticated folks and they

4   are also charged with reading the entire document, and there

5   are multiple places in this document where it's reserved to the

6   seller the ultimate say-so yea or nay and it seems to me, as I

7   read it, that that should have been quite clear.

8          MR. PILIERO:  If I may, and I'm not going to beat the

9   horse.  The horse is dead and on the way to the glue factory, I

10  understand that.  But let me just make one more observation.

11  In the subject to confirmation section, that is certainly

12  contradicted -- let me put it this way.  Your Honor is

13  assuming, your Honor is assuming either this provision should

14  be ignored or if this provision counts your Honor is assuming

15  that the winning bidder did not go to Nationstar and say okay

16  to give it to Truman?

17         THE COURT:  The auctioneer.

18         MR. PILIERO:  The auctioneer, the auctioneer didn't

19  go, because maybe it did.  I don't have the facts yet.  If it

20  did, would that change your position?  If the auctioneer went

21  to Nationstar and said Truman got a great deal above the

22  reserves, let's do it.

23         THE COURT:  Why would it make any sense?

24         MR. PILIERO:  Because --

25         THE COURT:  This is business.  This is about making

E87FTRUA

1    money.

2          MR. PILIERO:  I have a theory.  Do you want me to tell

3    you the theory?

4          THE COURT:  Yes.

5          MR. PILIERO:  For a mortgage servicer to sell

6    non-performing loans is very, very unusual.  There happened to

7    be a provision in this master servicing agreement that allows

8    it.  Why was it unusual?  Because it results in a situation

9    where the note holder, because these are all packaged.  The

10   note holders don't maximize their recovery when the Nationstars

11   of the world sell it this way.  The way they -- the way they

12   maximize the recovery, okay, is to have them go through the

13   foreclosure process and to have a complete foreclosure sale,

14   but that costs Nationstar money to do that.  They've got to

15   continue to service non-performing loans and spend the money on

16   a foreclosure, okay?  So what they do is they do this auction,

17   people like KIRP, who own the mortgages, say you can't get away

18   with this stuff, you're disadvantaging us with respect to the

19   ultimate value of our notes.  Nationstar took a shot, KIRP

20   thought about it, KIRP said, you know what, Quinn Manuel is

21   representing KIRP, Quinn Manuel says I've got KIRP right now

22   but I have 50 others right now who also don't like the idea

23   you're taking money out of the note holders' pockets.

24          So you want a logical explanation for why they didn't

25   want to go forward with this?  They didn't want a billion

E87FTRUA

1    suits.  They said let's disadvantage Truman, let's move on.

2    They're not doing it anymore.  Why aren't they doing do it

3    anymore?  Because it became a bad business judgment.  I don't

4    know everything about the industry, but there's lots of reasons

5    we can't fathom or we certainly don't know that might be why

6    Nationstar, said, hey, even though this is business, I better

7    not be selling these, I better go back to my knitting and

8    service them.  We don't know this until discovery.

9              By your interpretation, Judge, it is critical to know

10   whether or not Nationstar approved this sale.

11             THE COURT:  I'm only reacting to what your --

12             MR. PILIERO:  I'm shouting.  I'm sorry, Judge.

13   Forgive me.

14             THE COURT:  It's all right.  There's a lot of money at

15   stake.

16             MR. PILIERO:  I think at a minimum it's an ambiguous

17   contract.  I believe.

18             THE COURT:  Let me say in focusing on the subject to

19   confirmation provision I am more reacting to what you're

20   arguing and pointing out why I don't think it's as strong an

21   argument as you think it is.  More than simply relying on that

22   by itself I think that as I pointed out I think there are four

23   parts of this contract which receive little red stars on my

24   marked up version that speak to this reservation on the part of

25   the seller to make the final judgment as to whether it wishes

E87FTRUA

1    to go through with this deal or not.

2          But let me ask, because they've gotten off easy,

3    the --

4          MR. PILIERO:  Please.

5          THE COURT:  Nationstar's counsel, the plaintiff argues

6    that the contract has to be bilateral.  So what obligation do

7    you accept or maintain that you had as seller after the

8    plaintiff was declared the winning bidder?

9          MR. PREVIN:  Your Honor, I think the terms, the

10   auction terms made quite clear that at that point the seller,

11   Nationstar, has the obligation to consider the bid, the winning

12   bid and choose whether or not to submit a loan sale agreement

13   to the winning bidder.

14         Just going back for just a moment, I think your Honor

15   is correct that this is functionally a conditional auction.

16   There's no conflict between a reserve auction and a conditional

17   auction, there are just multiple conditions.  The auctioneer in

18   a conditional auction is without authority to accept and create

19   a binding contract.  All the auctioneer can do is to designate

20   who the winning bidder is and then it's up to the seller to

21   decide whether or not to submit a loan sale agreement and it's

22   very clear in the contract what the contours of that loan sale

23   agreement have to be and it's certainly not an e-mail notifying

24   the winning bidder that it has won the auction, that it

25   submitted the winning bid.  So I would submit, your Honor, that

E87FTRUA

1    once the winning bid e-mail has gone out it is incumbent on the

2    seller to choose whether or not to consider the bid in good

3    faith and elect whether or not to submit a loan sale agreement.

4              THE COURT:  Would you accept the notion that if there

5    is a winning bidder that that would preclude Nationstar from

6    considering bids from anyone else, that you're in a position of

7    accepting or rejecting the winning bid, but you can't deal with

8    another bidder?

9              MR. PREVIN:  I think obviously that's going a little

10   beyond the facts here, but one could construct that argument

11   that you could potentially read into this that there's a

12   potential good faith obligation not to turn around and sell to

13   anyone else.  But it's very clear in the contract that the

14   seller reserves the right not to sell the loans at all and not

15   to submit a loan sale agreement.

16             If you look back, your Honor, to the section you

17   directed us to, the bidding and winning section of the auction

18   terms, it's plain as can be this is a multistep process.  It

19   begins with an auction, the auctioneer designates who the

20   winning bidder is and I'm midway through the bidding and

21   winning paragraph.  Let me start with the second sentence, if I

22   may.  "To purchase a particular note at the auction one must be

23   acknowledged by the auctioneer as the winning bidder."  That's

24   step one.  "Then if you are the winning bidder you will be

25   contacted by phone by an auctioneer representative at the phone

E87FTRUA

number you provided.  Once contacted by the auctioneer

representative," so now we're moving on to the next step, "the

winning bidder will be sent by e-mail the loan sale agreement

and certain other documentation for electronic signature."  So

that's step two.

Then you skip down to the last sentence of that

paragraph, "After executing a loan sale agreement which shall

be executed within two hours of auctioneer's acknowledgment of

the winning bid," so it's clear those are two different things.

Winning bidder will be contacted by an escrow closing agent or

settlement attorney who will provide them certain additional

information pertaining to a closing process.  All of those

steps have to take place before there's a final deal.

So I'm not sure if I answered your Honor's question,

but I think that the contract is very clear that the

auctioneer -- that the seller reserves the right not to proceed

with the sale until all of those steps have been completed.

MR. PILIERO:  I can't resist, I'm sorry.

THE COURT:  Please.

MR. PILIERO:  You asked him, in a bilateral contract

what's the promises that Nationstar made?  What came back was

we'll consider the bid and we'll choose whether to go forward

with the sale.  So that's their promise, okay?  Now look at our

promise, okay, and how do we look at our promise?  Let's look

at it in terms of the remedies if we don't honor our promise to

E87FTRUA

purchase.  And the remedies are specific performance and

liquidated damages.  Respectfully, is it rational to assume

that there would be a contract, a bilateral contract where one

party says I'll think about selling you the notes, and the

other party says I promise I will buy the notes and I'll pay

you a fortune if I don't.  That's either an illusory contract,

which isn't a contract and therefore not enforceable --

            THE COURT:  Why would that be any different from a

conditional auction?

            MR. PILIERO:  Because, with all due respect, we're

implying the notion it's a conditional auction.  It's not.

It's a reserve auction.

            THE COURT:  But if you want to argue it's grossly

unfair and therefore it can't be construed that way, isn't a

proper response to that the gross unfairness that you're

pointing to is effectively a conditional auction which is a,

it's sort of a one-sided deal.  This was actually a kind of

one-sided arrangement.

            MR. PILIERO:  I'll warrant, your Honor, there's never

been a conditional auction that had a specific performance

obligation on the part of the buyer.  It is indeed a one-sided

contract, a one-sided arrangement.  It's just one-sided.  It

says, I have to decide whether to give it to you.  It doesn't

say but if you weasel out on me you pay me a fortune.  That's

not a conditional auction, that's a reserve auction, that's

E87FTRUA

what this auction is and it's respectfully a bilateral contract
that is very badly drafted, very badly drafted.  At best it's
ambiguous.

I believe that given the way the auctioneer is the
agent and given all the other things we've spoken to, I think
the way to harmonize all the provisions and the only way to
follow the contract interpretation principle giving effect to
all the provisions is the way in which we suggested, which is
to look at the language as contract of sale or loan sale
agreement and you still have the problem and I give it to you,
that it's not signed by the seller and the auctioneer is not
the seller.  Again, it's not clean.  And I didn't draft the
contract.  At most, as I say, it's ambiguous, it cuts both
ways.  But it makes no sense to me to say that on the one hand
I'll think about it, on the other hand you owe me a fortune.

THE COURT:  You're just talking sort of more like
broad equities.

MR. PILIERO:  I know.

THE COURT:  Does it make sense to compel a party to
sell something that they have decided that they don't want to
sell in favor of giving the judgment to a company who believes
that they got a good deal and that they would in the future
make money from that?  That's a theoretical windfall -- it may
not be a windfall, but it's a future prospective economic
advantage versus compelling someone to sell when there's a

E87FTRUA

1      document which over and over again says you can't compel us to

2      sell, we retain the right not to do so.  At most, and I don't

3      know that it would work, but at most some equity balance might,

4      might, but I don't think it works, to say, well, we expended X

5      dollars preparing this bid, we should be compensated for that

6      because, you know, your document wasn't clear enough that this

7      might be, you know, a fool's errand.  But the reality is

8      everybody else that bid, who didn't put in the winning bid in

9      the sense suffered the same expenditures in terms of preparing

10     the bid.

11          MR. PILIERO:  That's also -- with all due respect,

12     that's also outside the record.  We don't know whether or not

13     Nationstar paid any of the expenses for those, those due

14     diligence expenses.  We don't know that.  There were a lot of

15     other bidders.  No, no.  You're assuming we were the only

16     winning bidder.  There were a lot of winning bidders.

17          THE COURT:  I'm assuming that a whole bunch of folks

18     participated in this auction, that you were not the only

19     bidder.  All I'm suggesting is that participating in an auction

20     like this does, as you indicated, involve a certain amount of

21     effort.  It's not just a, you know, like a thought process when

22     Sotheby's puts a piece of art up for sale and some rich guy

23     says how much do I want to part with my millions to buy this,

24     he might do a little research to find out what the market is

25     for Picassos that are similar or whatever.  But you're saying

E87FTRUA

1    that there was a lot more due diligence efforts.  I'm just

2    suggesting that anybody that bid in this auction presumably

3    went through the same type of due diligence to justify the bid

4    that they made.  But they all took a risk that they might not

5    win and if you aren't the winning bidder those expenses were

6    down the drain in any event.

7              MR. PILIERO:  All I'm suggesting is that they did not

8    take the risk that they would be the winning bidder and still

9    not get the notes.  That's not the risk they take.

10             THE COURT:  Well, sometimes, you know, you fudge it.

11             All right.  Okay.  Go you want to say anything else?

12             MR. PREVIN:  No, your Honor, we think you understand

13   the contract.

14             THE COURT:  All right.  We'll give if this some more

15   thought and issue a written decision.

16             MR. PILIERO:  Thank you very much for your time,

17   Judge.

18             (Adjourned)

19

20

21

22

23

24

25